UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MELVIN GROSS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TIME WARNER, INC., JEFFREY L. BEWKES, JAMES L. BARKSDALE, WILLIAM P. BARR, ROBERT C. CLARK, MATHIAS DÖPFNER, JESSICA P. EINHORN, CARLOS M. GUTIERREZ, FRED HASSAN, PAUL D. WACHTER, and DEBORAH C. WRIGHT,<br><br>Defendants. | Civil Action:<br><br>**JURY DEMANDED** |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Melvin Gross ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this class action on behalf of the public stockholders of Time Warner, Inc. ("Time Warner" or the "Company") against the members of Time Warner's Board of Directors (the "Board") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rules 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 229.1015(b)(4), arising out of their attempt to sell the Company to AT&T Inc. ("AT&T").

2. On October 22, 2016, AT&T and Time Warner announced they had entered into an Agreement and Plan of Merger, dated October 22, 2016 ("Merger Agreement"), by which

AT&T, through its wholly owned subsidiary, West Merger Sub, Inc. ("Merger Sub"), will acquire all of the outstanding shares of Time Warner in a stock-and-cash transaction valued at $107.50 per share (the "Proposed Transaction"). The merger consideration is comprised of $53.75 per share in cash and $53.75 per share in AT&T stock. The stock portion will be subject to a collar such that Time Warner stockholders will receive 1.437 AT&T shares if AT&T's average stock price is below $37.411 at closing and 1.3 AT&T shares if AT&T's average stock price is above $41.349 at closing.

3. The Proposed Transaction has a total transaction value of approximately $108.7 billion and is expected to close before year-end 2017.

4. On January 9, 2017, Time Warner filed a definitive proxy statement on a Schedule 14A (the "Proxy") with the SEC, which set the stockholder vote date on the Proposed Transaction for February 15, 2017. The Proxy is materially deficient and misleading because, *inter alia*, it fails to disclose material information regarding Generally Accepted Accounting Principles ("GAAP") reconciliation of the non-GAAP financial measures contained in the Company's projections, which were prepared by Company management and relied upon by Allen & Company LLC ("Allen"), Citigroup Global Markets Inc. ("Citi"), and Morgan Stanley & Co. LLC ("Morgan Stanley"), the Company's financial advisors.

5. Without additional information, the Proxy is materially misleading in violation of federal securities laws.

6. By unanimously approving the Proposed Transaction and authorizing the issuance of the Proxy, Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially incomplete and misleading. The Proxy is an

essential link in obtaining stockholder approval for the Proposed Transaction.

7. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from conducting the stockholder vote on the Proposed Transaction on February 15, 2017 unless and until the material information discussed below is disclosed to Time Warner's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

9. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Time Warner maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

11.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Time Warner.

**The Company**

12.     Time Warner is a corporation organized and existing under the laws of the State of Delaware. It maintains principal executive offices at One Time Warner Center, New York, NY 10019.

**Director Defendants**

13.     ***Defendant Jeffrey L. Bewkes*** ("Bewkes") is Chairman and Chief Executive Officer ("CEO") of the Company. Bewkes was elected Chairman of the Board in January 2009, previously having served on the Board since January 2007. Bewkes was elected CEO of the Company in January 2008. Additionally, Bewkes served as President and Chief Operating Officer ("COO") of the Company from January 2006 to December 2007 and as Chairman of the Entertainment and Networks group from July 2002 to December 2005.

14.     ***Defendant James L. Barksdale*** ("Barksdale") has served as a director of the Company since January 2001.

15.     ***Defendant William P. Barr*** ("Barr") has served as a director of the Company since July 2009.

16.     ***Defendant Robert C. Clark*** ("Clark") had served as Lead Independent Director and has been a director of the Company since January 2004.

17.     ***Defendant Mathias Döpfner*** ("Döpfner") has served as a director of the

Company since July 2006.

18. ***Defendant Jessica P. Einhorn*** ("Einhorn") has served as a director of the Company since May 2005.

19. ***Defendant Carlos M. Gutierrez*** ("Gutierrez") has served as a director of the Company since October 2013.

20. ***Defendant Fred Hassan*** ("Hassan") has served as a director of the Company since October 2009.

21. ***Defendant Paul D. Wachter*** ("Wachter") has served as a director of the Company since October 2010.

22. ***Defendant Deborah C. Wright*** ("Wright") has served as a director of the Company since May 2005.

**Relevant Non-Parties**

23. Relevant non-party AT&T is a corporation organized and existing under the laws of the State of Delaware. AT&T maintains its principal executive offices at One AT&T Plaza, 208 South Akard Street, Dallas, TX 75202.

24. Relevant non-party Merger Sub is a Delaware corporation and wholly owned subsidiary of AT&T that was created for the purposes of effectuating the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

**Company Background and Potential Growth**

25. Time Warner, a Delaware corporation, purports to be a leading media and entertainment company. The Company classifies its businesses into the following three reportable segments: (a) Turner, consisting principally of cable networks and digital media

properties; (b) Home Box Office, consisting principally of premium pay television and streaming services domestically and premium pay, basic tier television and streaming services internationally; and (c) Warner Bros., consisting principally of television, feature film, home video and videogame production and distribution.

26. Over the last several years, the Company has transitioned its business to focus on the production and distribution of high-quality video content to take advantage of growing global demand. The Company's businesses work together to leverage their strong brands, distinctive intellectual property and global scale to produce and distribute content that resonates deeply with consumers. As the television industry continues to evolve, with developments in technology, rapid growth of new video services and shifting consumer viewing habits, the Company purports to be well-positioned to address and capitalize on these changes.

27. On November 2, 2016, Tim Warner issued a press release that announced the Company's financial results for the third quarter of 2016. The Company reported a 9% increase in revenue to $7.2 billion, and operating income grew 10% to $2.0 billion. Bewkes commented on the positive results stating:

> We had a strong third quarter, which keeps us on track to exceed our original 2016 outlook and underscores our leadership in creating and distributing the very best content. In television, HBO took home more Primetime Emmy Awards than any other network for the 15th consecutive year and Time Warner's divisions won a total of 40 Emmys, more than any other company. CNN's standout election coverage made it the #1 news network in primetime among adults 18-49 for the fourth consecutive quarter and Turner's momentum doesn't stop there. Year-to- date, TBS, TNT and Adult Swim are three of the top five ad-supported cable networks in primetime among adults 18-49. In film, Warner Bros. had a strong quarter led by *Suicide Squad* and has the #1 release of the fall in *Sully*, while anticipation is off the charts for J.K. Rowling's *Fantastic Beasts and Where to Find Them*, which hits

the big screen on November 18.

28. On the same day that it announced its third quarter 2016 financial results, Time Warner increased its full-year 2016 business outlook. In a Company press release it was reported that the Company expects the 2016 full-year Adjusted EPS to be in the range of $5.73 to $5.83.

29. On August 25, 2016, at a meeting between Bewkes and Randall Stephenson, Chairman and CEO of AT&T, Mr. Stephenson expressed an interest in exploring a potential combination of Time Warner and AT&T, indicating an acquisition price of the Company in the range of $100 per share. Bewkes concluded that he would discuss such a transaction with the Board.

30. The next day, Bewkes informed Stephen Bollenbach ("Bollenbach"), the then-Lead Independent Director for the Company, and informed Mr. Bollenbach of AT&T's approach.

31. On August 29, 2016, Time Warner and AT&T executed a confidentiality agreement.

32. On September 2, 2016, Mr. Stephenson reiterated to Bewkes that he continued to believe that AT&T could pay a price in the range of $100 per share to acquire Time Warner.

33. On September 7, 2016, the Board authorized engagement with AT&T, including mutual due diligence, to enable AT&T to improve its initial proposed value and come forward with a more definitive proposal.

34. Between September 9, 2016 and September 22, 2016, representatives of Time Warner and AT&T, and their respective legal and financial advisors, engaged in further telephonic discussions and had two in-person meetings.

35. On September 28, 2016, Mr. Stephenson offered a proposal for AT&T to acquire Time Warner for $103 per share, consisting of 45% cash and 55% AT&T common stock, subject to a 5% symmetrical collar on the stock component. In response, Bewkes indicated that the Board would require a purchase price well above Mr. Stephenson's proposal in order to pursue a potential combination with AT&T. Mr. Stephenson then stated that AT&T could increase its proposal to $105 per share, subject to a 4% symmetrical collar on the stock component, but that there would be no basis for further discussion if the Company's price expectation was in the teens.

36. On October 6, 2016, the Board held an in-person meeting at Cravath's offices in New York, with representatives of Time Warner's management, Allen & Company and Cravath participating, to consider AT&T's revised proposal. At the meeting, representatives of Time Warner's management discussed with the Time Warner Board Time Warner's 2016 year-to-date operating and financial performance and the long-range plan approved by the Time Warner board in January 2016. Allen & Company discussed with the Time Warner Board preliminary financial perspectives regarding Time Warner, AT&T and AT&T's revised proposal, including certain considerations regarding AT&T common stock. The Time Warner Board discussed, among other things, other potential acquirors of Time Warner, the likelihood that any of them would provide a transaction superior to that being proposed by AT&T and how best to determine whether such a superior transaction could be obtained, as well as the latitude the Time Warner Board would have under a merger agreement with AT&T to consider competing proposals following execution of an agreement with AT&T.

37. On October 7, 2016, Bewkes and Mr. Stephenson continued their discussion of

price and other deal terms. Bewkes proposed a price of $110 per share consisting of 50% cash and 50% AT&T common stock, subject to a 5% symmetrical collar on the stock component of the consideration. Mr. Stephenson noted that AT&T already had improved the offer price significantly and for AT&T to consider any further increase, AT&T would need to conduct additional due diligence.

38. On October 11, 2016, representatives of Time Warner and AT&T, including Messrs. Bewkes and Stephenson, met in Dallas, TX, to, among other things, provide additional information with respect to Time Warner's businesses. Following the meeting, Messrs. Bewkes and Stephenson continued their discussion of price and other deal terms, culminating in Messrs. Bewkes and Stephenson agreeing to continue to work towards a transaction based on a purchase price of $107.50 per share, consisting of 50% cash and 50% AT&T common stock, with a 5% symmetrical collar on the stock component of the consideration, a regulatory commitment with respect to completing the transaction with details to be refined further among the legal teams and a $500 million payment in the event regulatory approvals could not be obtained. Messrs. Bewkes and Stephenson also discussed the termination fee that would be payable in the event the Time Warner board were to pursue an alternative proposal that was superior to the transaction with AT&T.

39. Between October 13 and October 15, 2016, Time Warner contacted each of Citi and Morgan Stanley to engage them to act as financial advisors, together with Allen, to Time Warner in connection with the potential transaction with AT&T.

40. Also, between October 13, 2016 and October 22, 2016, Time Warner and its legal advisors and AT&T's legal advisors had multiple meetings to negotiate the terms of the Merger Agreement.

41. On October 22, 2016, the Board approved the Proposed Transaction, and Time Warner and AT&T executed the Merger Agreement.

## THE MATERIALLY MISLEADING AND INCOMPLETE PROXY

42. Defendants have failed to provide stockholders with material information necessary for an informed vote on the Proposed Transaction. The Proxy, which recommends that the Company's stockholders vote in favor of the Proposed Transaction on February 15, 2017, misrepresents and/or omits material information in violation of Sections 14(a) and 20(a) of the Exchange Act.

43. The Proxy fails to provide material information concerning the Company's financial projections. Specifically, with respect to the Company's projections, the Proxy states the following:

> Certain of the Time Warner management forecasts set forth below may be considered non-GAAP financial measures. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with U.S. GAAP, and non-GAAP financial measures as used in the Time Warner management forecasts may not be comparable to similarly titled measures used by other companies.

44. The Proxy goes on to provide Company projections for various metrics including revenue, Adjusted Operating Income Before Depreciation and Amortization ("OIBDA"), and unlevered free cash flow. However, the Proxy fails to provide line item metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP. The omission of such projections renders the non-GAAP projections included in the Proxy materially incomplete and misleading.

45. When a company discloses non-GAAP financial metrics to stockholders, the

Company must also disclose comparable GAAP metrics and a quantitative reconciliation of forward-looking information. Otherwise, non-GAAP financial metrics are likely to mislead stockholders concerning the true state of a company's finances.

46. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial metrics in communications with stockholders. The SEC Chairwoman Mary Jo White stated that the frequent use by publicly traded companies of unique company-specific non- GAAP financial measures (as Time Warner has included in the Proxy), implicates the centerpiece of the SEC's disclosure regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non- GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

47. In addition, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.

48. On May 17, 2016, the SEC's Division of Corporation Finance released new

and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial metrics that demonstrate the SEC is indeed tightening policy.  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

49. Thus, the above-referenced line-item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

50. Without this material information, the current disclosures are inherently materially incomplete and misleading, and the Company's stockholders cannot make an informed decision whether or not to vote in favor of the Proposed Transaction or seek appraisal for their shares, and are being harmed.

51. Defendants' failure to provide the Company's stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.  Defendants were aware of their duty to disclose this information.  The material information described above that was omitted from the Proxy takes on actual significance in the minds of the Company's stockholders in reaching their decision whether to vote in favor of the Proposed Transaction.  Absent disclosure of this material information prior to the vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm for which damages are not an adequate remedy.

## **CLASS ACTION ALLEGATIONS**

52.     Plaintiff brings this action as a class action on behalf of all persons and/or entities that own Time Warner common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. The Proxy states that, as of January 3, 2017, there were 771,830,769 shares of common stock outstanding. All members of the Class may be identified from records maintained by Time Warner or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

54.     Questions of law and fact are common to the Class, including (i) whether Defendants solicited stockholder approval of the Proposed Transaction through a materially false or misleading Proxy in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if securities laws violations are not remedied before the vote on the Proposed Transaction; and (iii) whether the Class entitled is to injunctive relief as a result of Defendants' wrongful conduct.

55.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

56.     Plaintiff will fairly and adequately protect the interests of the Class, and has no

interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

57. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)

58. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59. Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction

60. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61. Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, as set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omitted material facts that are necessary to render the statements that are made non-misleading.

62. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

63. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their right to cast a fully informed vote on the Proposed Transaction.

64. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Against the Director Defendants for Violations of Section 20(a) of the Exchange Act)

65. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66. The Director Defendants acted as controlling persons of Time Warner within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Time Warner, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67. Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68. In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Director Defendants to approve the Proposed Transaction. They were, thus, directly involved in the preparation and dissemination of the Proxy.

69. In addition, as the Proxy sets forth at length, and as described herein, that the Director Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Director Defendants reviewed and considered. The Director Defendants participated in drafting and/or gave their input on the content of those descriptions.

70. By virtue of the foregoing, the Director Defendants have violated Section 20(a) of the Exchange Act.

71. As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Director Defendants' conduct, Plaintiff will be irreparably harmed.

72. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally,

as follows:

 (A) declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

 (B) declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

 (C) preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

 (D) to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff and the members of the Class rescissory damages against the Director Defendants, including, but not limited to, pre-judgment and post-judgment interest;

 (E) awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

 (F) awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

 (G) granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: January 24, 2017

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
  Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF

I, Melvin Gross ("Plaintiff") hereby retain Gainey McKenna & Egleston and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Time Warner Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 6 | TWX | Buy | 11/14/2008 | $18.72 |
| 10 | TWX | Buy | 12/1/2008 | $17.16 |
| 8 | TWX | Buy | 12/5/2008 | $18.45 |
| 16 | TWX | Buy | 2/26/2009 | $15.995 |
| 25 | TWX | Buy | 3/3/2009 | $14.3828 |
| 10 | TWX | Buy | 6/30/2010 | $28.276 |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of January, 2017

Signature

Melvin Gross
Print Name (& Title if applicable)